966 So.2d 631 (2007)
STATE of Louisiana
v.
Gardener TAYLOR.
No. 06-KA-558.
Court of Appeal of Louisiana, Fifth Circuit.
July 30, 2007.
*633 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District Parish of Jefferson, Terry M. Boudreaux, Thomas J. Butler, Ken J. Dohre, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
*634 Panel composed of Judges EDWARD A. DUFRESNE, JR., WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
WALTER J. ROTHSCHILD, Judge.
On January 6, 2004, the Jefferson Parish District Attorney filed a bill of information charging defendant, Gardener Taylor, with possession with intent to distribute marijuana within one thousand feet of a school, a violation of LSA-R.S. 40:981.3. Defendant was arraigned on January 8, 2004, and pled not guilty.
On January 15, 2004, defense counsel filed omnibus pre-trial motions, including a motion to suppress evidence. Defendant filed a pro se Motion to Suppress the Evidence on March 19, 2004, raising issues raised in the counseled motion. The trial court heard and denied the suppression motions on March 25, 2004. Defendant applied for writs to this Court from the trial court's ruling. State v. Gardner Taylor, Writ No. 04-K-401.[1] On April 12, 2004, this Court denied writs, stating: "On the showing made we see no reason to exercise our supervisory jurisdiction." Defendant applied for writs to the Louisiana Supreme Court, challenging this Court's ruling, and the supreme court denied writs. State v. Taylor, 04-0970 (La.6/4/04), 876 So.2d 76.
Defendant was tried by a twelve-person jury on August 11, 2004. The jury returned a unanimous verdict of guilty as charged.
Defendant filed a motion for new trial on August 13, 2004. The trial court heard and denied the motion on September 10, 2004. Defendant waived sentencing delays, and the trial court sentenced him that day to seven years at hard labor, to be served concurrently with any other sentences he was serving.
The State filed a habitual offender bill of information alleging defendant to be a second felony offender. On September 24, 2004, defendant was advised of the allegations in the habitual offender bill, and he denied them.
On April 29, 2005, defendant admitted to the allegations in the habitual offender bill, and the trial court found him to be a second felony offender. The court then vacated defendant's original sentence and, citing State v. Dorthey, 623 So.2d 1276 (La.1993), imposed a habitual offender sentence of twelve years at hard labor without benefit of probation or suspension of sentence. The court further ordered that the sentence be served concurrently with any other sentences defendant is serving, and with any sentences resulting from a parole revocation.
Defendant filed a timely pro se motion for appeal on May 9, 2005. The trial court granted the motion on June 1, 2005.
FACTS
Officer Timothy Carman of the Gretna Police Department testified at trial that on the afternoon of December 1, 2003, he was dispatched to the 700 block of Governor Hall Street on a criminal complaint. The officer was dressed in uniform and was driving a marked police car. When he approached the said location, Officer Carman saw defendant sitting on the open tailgate of a gray truck, eating crabs.
Carman testified that, based on the complaint he received, he approached defendant on foot and introduced himself. Defendant *635 appeared extremely nervous. He was fidgety and avoided eye contact with the officer. Carman asked defendant if he was from that neighborhood, and defendant said he was not. Moreover, defendant could not give Carman the name or address of anyone he was visiting in the area. The officer asked defendant for his identification, and defendant gave it to him. Carman then ran defendant's personal information on the police computer to determine whether defendant had any outstanding warrants.
Carman testified that defendant continued to display nervous behavior, and the officer began to fear for his own safety. He asked defendant to put his hands on the truck's tailgate so he could conduct a patdown search of defendant's outer clothing for weapons. Defendant then reached for his left pants pocket. Fearing defendant was reaching for a weapon, the officer grabbed his hand and handcuffed him. Carman conducted a patdown search and felt a large lump in defendant's left pants pocket. To the trained officer, the lump felt like several small packages of a controlled dangerous substance.
Carman testified that he pulled out of defendant's pocket seven small plastic bags containing a green/brown vegetable substance which he believed was marijuana. On the outside of the bags was a Starship Enterprise logo, as seen on the television series Star Trek. Carman told defendant he was under arrest, and advised him of his Miranda rights.[2] The officer then conducted a search of defendant's person incident to arrest.
After learning from the police computer that the truck was registered to defendant, Carman asked him if he would consent to a vehicle search. Defendant replied, "I ain't got nothing but peanuts and candy apples in there." The officer asked again whether he could search the truck, and defendant said, "Yeah, you can search it."
Sergeant Jim Price testified he arrived at the scene after defendant was placed in handcuffs. Officer Carman told Price he had obtained defendant's consent to search the truck. Price then searched the passenger area of the vehicle and retrieved from the back seat two plastic popcorn bags and a plastic peanut bag which held a total of 29 smaller plastic bags containing what he believed to be marijuana. Price gave the evidence to Carman, who was responsible for transporting it to the police department. Price identified State's Exhibit 2 as three plastic bags of marijuana, bearing the Starship Enterprise Logo, that he recovered from the truck. He identified State's Exhibit 3 as a peanut bag that contained the three bags in State's Exhibit 2. State's Exhibit 4 was a group of 11 bags of marijuana Price found in the truck. State's Exhibit 5 was a popcorn bag that held the 11 smaller bags in Exhibit 4. State's Exhibit 6 was a group of 15 plastic bags of marijuana. State's Exhibit 7 was a popcorn bag that held the 15 bags in State's Exhibit 6.
Officer Carman testified that Gretna No. 2 Elementary School is located in the 700 block of Amelia Street. The officer said one can clearly see the school grounds from where defendant was standing. Carman measured the distance between where defendant was to the nearest part of the school grounds. He used a "measure master," a wheeled instrument that counts distance as it is rolled along the ground. The distance measured 394 feet.
Daniel Waguespack of the Jefferson Parish Crime Lab, was accepted by the trial court as an expert in the field of *636 forensic science. Waguespack testified that he examined and tested representative samples of the vegetative material from State's Exhibits 1, 2, 4, and 6. All of the samples tested positive for marijuana. Waguespack included his findings in a lab report. He testified that the net weight of the marijuana in State's Exhibits 1, 2, 4, and 6 was 57.6 grams.
The State introduced the testimony of Lieutenant Bruce Harrison, whom the trial court accepted as an expert in the packaging, distribution, and value of controlled dangerous substances. Harrison testified he was not involved in the investigation of the instant offense, but he had reviewed the police incident report.
According to Harrison, the three most important factors in distinguishing between simple possession and possession with intent to distribute narcotics are quantity, packaging, and value. In his opinion, the quantity, packaging, and value of the marijuana seized in this case were consistent with distribution rather than simple possession.
Harrison first explained that, as is true in any trade, it is more expensive to buy marijuana in small quantities than to buy it in large amounts. Harrison noted that the 56 grams of marijuana in this case was packaged in a total of 36 bags. To buy those individual bags for personal use would cost about $230, whereas 56 grams of marijuana that is not broken down into smaller quantities would cost about $140-160. If a user bought such a large quantity of marijuana that was not broken down, he would not typically divide it into smaller bags, as was done here. He would simply take some out of the large package as he used it.
Harrison noted that all of the small bags of marijuana bore the same Starship Enterprise logo. He said the bags all likely came from the same source, explaining that a distinctive logo is a way in which a dealer identifies his product.
Harrison felt the quantity of marijuana in this case was too large to indicate personal use. To use even five to ten grams of marijuana in a day, a user would have to smoke a cigarette every waking hour. Moreover, if someone had marijuana for his own use, Harrison would expect to see user paraphernalia, such as cigarette rolling papers. No such paraphernalia was recovered in this case.
Harrison further testified to the fact that defendant did not have a large amount of money when he was arrested was not necessarily an indication that he was not selling marijuana. Sometimes a seller will have a lot of money on his person when he is apprehended, but it is more common for a seller not to carry much money. In defendant's case, his money might have been at his house, or he might have just started selling when Detective Carman stopped him.
Isaac Williams was the only witness for the defense. He testified that on December 1, 2003, he was living at 721 Governor Hall Street, Apartment 1. Williams knows defendant, who grew up in Gretna. He saw defendant pull up in front of his residence at about 1:00 p.m. Defendant sat on the back of his truck eating seafood for 15-20 minutes before police arrived. During that time Williams did not see anyone approach defendant. Williams testified that he chose not to get involved in the incident when police arrived.
ASSIGNMENT OF ERROR NUMBER ONE
The trial court erred in failing to grant the defense's motion to suppress the evidence because the evidence was illegally retrieved.
*637 DISCUSSION
By this assignment, defendant contends Detective Carman did not have reasonable suspicion to conduct an investigatory stop, nor did he have probable cause for an arrest. Therefore, defendant argues, any evidence seized pursuant to the stop and/or the subsequent arrest was suppressible.
The State responds that Carman had reasonable suspicion to stop defendant because defendant met the description given by an anonymous caller of a man selling narcotics to school aged children in that area. The State further argues the officer legally seized the marijuana in defendant's pocket during a pat-down frisk, under the "plain feel" exception to the warrant requirement. As regards the marijuana found in defendant's truck, the State maintains it was legally seized pursuant to a valid consent search.
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. Warrantless searches and seizures are unreasonable per se unless justified by one of the exceptions to the warrant requirement. State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330, 335-336. The State bears the burden of proving the admissibility of evidence seized without a warrant. LSA-C.Cr.P. art. 703 D; State v. Leonard, 06-361 (La.App. 5 Cir. 10/31/06), 945 So.2d 764, 765. A trial court is afforded great discretion in ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. State v. Leonard, 945 So.2d at 765-766. In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress, but may also consider pertinent evidence given at trial. State v. Higgins, 01-368 (La.App. 5 Cir. 10/17/01), 800 So.2d 918, 921, writ denied, 01-3267 (La.11/1/02), 828 So.2d 565, cert. denied, 538 U.S. 1038, 123 S.Ct. 2082, 155 L.Ed.2d 1070 (2003).
At the suppression hearing, Officer Carman testified he was with the Gretna Police Department from May, 1995 through September, 1998. He returned to the department in August, 2003. In the interim, he was an embassy guard with the United States Marines Corps, and he worked for a time as a narcotics detection dog handler with the United States Border Patrol. He was also a special agent in the United States Customs Department's high intensity drug trafficking unit.
Officer Carman testified that on December 1, 2003, he was dispatched to the 700 block of Governor Hall Street based on a 9-1-1 call regarding a black man sitting on a gray pickup truck and selling narcotics to children. The officer said narcotics arrests are common in that area. When Carman arrived at the designated place, he saw a gray Dodge truck parked on the street. Defendant, a black man, was sitting on the truck's open tailgate eating crabs. Carman stopped his police unit and approached defendant on foot. He introduced himself and asked defendant for his identification. Defendant gave Carman his identification, and the officer called in defendant's personal information to determine if he had any outstanding warrants. Carman testified defendant was still free to leave at that point.
Carman asked defendant whether he was from that area. Defendant replied he was from New Orleans, and that he was in the neighborhood visiting. When the officer asked him which house he was visiting, defendant pointed to a residence. But he was unable to tell Carman who lived there.
*638 Carman testified that while he was speaking to defendant, defendant appeared nervous, and his hands shook badly. Defendant would not make eye contact with him. Carman decided, for his own safety, to conduct a pat-down search of defendant's outer clothing for weapons. Carman was investigating alleged drug activity, and based on his experience as a police officer, he knows drugs and weapons often go hand-in-hand.
The officer instructed defendant to turn around and place his hands on the truck's tailgate. As defendant turned to comply with the order, he moved his hand toward his left pants pocket. Fearing defendant might be reaching for a weapon, Carman grabbed his hand, and placed him in handcuffs. Carman testified that he patted down defendant's outer clothing. When he got to defendant's left pants pocket, Carman felt what he believedbased on his police experiencewere "baggies" of narcotics. The officer reached into defendant's pocket and retrieved seven small glassine bags containing what appeared to be marijuana. At that point he placed defendant under arrest.
Carman testified he advised defendant of his rights, and asked him for permission to search his truck. Defendant gave his consent to search, commenting that there was nothing inside the vehicle except peanuts and candy apples. Sergeant Price, who had arrived at the scene, searched the truck and found bags containing marijuana.
On cross-examination, Carman testified he spoke to a woman at the scene after he arrested defendant. She said defendant was frequently in the area eating crabs, and that he did not sell drugs.
Defendant testified on his own behalf at the suppression hearing. He stated he was simply eating crabs when the officer stopped him. He was not selling marijuana, nor was he committing any other crime. He was on Governor Hall Street to visit a woman named Rena. Defendant testified that Rena told the officer he visited that neighborhood all the time.
Defendant said the only time he went into his pocket was when he took out his driver's license and gave it to the officer. He admitted to having four bags of marijuana in his pocket; not seven, as the officer claimed. He did not give the officers his permission to search his truck. Moreover, there was no marijuana in the vehicle. In denying defendant's suppression motion, the trial judge reasoned:
Okay. The court finds, based on the totality of the circumstances, including the 911 call, the notice that it was a high-drug area, the responses, that the police officer had a reasonable suspicion, that he could stop and talk to the defendant, that the remainder of the circumstances, including the defendant's actions, answers to the questions about why he was there and who he was there to visit, which were vague and did not know which house he was supposed to go to, the nervousness, the failure to keep eye contact alerted the officer that he could talk to him with a pat down of his outer garments, and the defendant's thrusting his hand into his left pocket were reasonable for the officer to then search that pocket for any weapon, which then he could legally obtain the contraband. And, consequently, I believe that the search or the evidence obtained was not unconstitutionally obtained.
The right of law enforcement officers to stop and interrogate those reasonably suspected of criminal activity is recognized by state and federal jurisprudence, and is codified in LSA-C.Cr.P. art. 215.1. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 *639 L.Ed.2d 889 (1968); State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Reasonable suspicion is something less than probable cause to arrest, and requires that police officers have sufficient knowledge of facts and circumstances to justify an infringement of the individual's right to be free from government interference. State v. Chauvin, 06-362 (La.App. 5 Cir. 10/31/06), 945 So.2d 752, 757-758. A police officer must be able to articulate specific facts upon which his suspicion is based. Id., 945 So.2d at 758.
The facts upon which an officer bases an investigatory stop should be evaluated in light of the circumstances surrounding the incident. A reviewing court must take into consideration the totality of the circumstances and give deference to the inferences and deductions of a trained police officer that might elude an untrained person. State v. Huntley, 97-0965 (La.3/13/98), 708 So.2d 1048, 1049. An officer's experience, his knowledge of recent criminal patterns and his knowledge of an area's frequent incidence of crimes, are factors that may support reasonable suspicion of an investigatory stop. State v. Atkins, 05-823 (La.App. 5 Cir. 3/14/06), 926 So.2d 591, 596.
In the instant case, the officer was dispatched to Governor Hall Street based on an anonymous 9-1-1 call. Under certain circumstances, an anonymous tip can provide reasonable suspicion to detain and question a person. Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); State v. Smith, 00-1838 (La.5/25/01), 785 So.2d 815 (per curiam). Generally, an informant's tip must contain predictive information regarding the future behavior of the reported suspect, and the tip must be corroborated. Alabama v. White, supra; State v. Robertson, 97-2960 (La.10/20/98), 721 So.2d 1268, 1270. Defendant argues the 9-1-1 call in this case did not provide a sufficient basis for reasonable suspicion, since the officer did not observe any behavior on his part to corroborate the anonymous tipster's allegations.
It is true that Officer Carman did not see defendant engage in any illegal activity prior to stopping him. But police officers have the authority to stop someone in a public place, if they reasonably suspect that person is about to commit an offense, even though no illegal activity has yet taken place. State v. Jackson, 02-146 (La.App. 5 Cir. 5/29/02), 820 So.2d 1147, 1151. Officer Carman testified defendant and his vehicle fit the description given by the 9-1-1 caller. Even though Carman only saw defendant eating crabs, the officer was free to approach defendant and engage him in conversation.
While an individual's mere presence in a high crime area, standing alone, is insufficient to justify an investigatory stop, his presence in a high crime area coupled with nervousness, startled behavior, flight or suspicious actions upon the approach of an officer, gives rise to reasonable suspicion for an investigatory stop. State v. Young, 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 97. The street where defendant was parked was known to Officer Carman as a drug trafficking area. That, together with the 9-1-1 complaint, defendant's nervous behavior when approached by the officer, and the ambiguity of defendant's answers when he was questioned about what he was doing there, was sufficient to support reasonable suspicion for an investigatory stop.
An officer who has stopped a person for questioning may conduct a limited frisk of that person's outer clothing where circumstances are such that a reasonably prudent man would be warranted in the *640 belief that his safety or that of others was in danger. LSA-C.Cr.P. art. 215.1 B; State v. Keller, 403 So.2d 693, 697 (La. 1981); State v. Martinez, 04-38 (La.App. 5 Cir. 4/27/04), 874 So.2d 272, 277. Defendant argues Officer Carman was not justified in conducting a pat-down frisk of his clothing because he had no reason to fear for his safety. On the contrary, Carman was justified in his suspicion that defendant might be armed based on the fact that he suspected defendant of drug activity, and the officer knew from experience that drugs and weapons often go together. State v. Broussard, 00-3230 (La.5/24/02), 816 So.2d 1284, 1288-1289. Carman's safety concerns escalated when defendant attempted to reach for his pants pocket. The officer's pat-down frisk fell within the scope of the investigatory stop.
If, in the course of an Article 215.1 weapons frisk, an officer feels an object whose contour or mass makes its identity as contraband immediately apparent, the officer may seize it under the "plain feel" exception to the warrant requirement. Minnesota v. Dickerson, 508 U.S. 366, 377, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993); State v. Broussard, 816 So.2d at 1289. Carman's testimony shows he is an experienced police officer who has made hundreds of narcotics arrests. Carman stated that when he patted defendant's pocket, he felt several objects that he believed, based on his law enforcement training and experience, were baggies of marijuana. We find that the officer's seizure of marijuana from defendant's pocket was valid under the "plain feel" exception. Once Carman found the marijuana in defendant's pocket, he had probable cause to arrest defendant.
The officers were authorized to search the truck based on defendant's voluntary consent. See, Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Wilson, 467 So.2d 503 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). The burden is on the state to prove the consent was given freely and voluntarily. Officer Carman testified both at the suppression hearing and at trial that defendant gave his voluntary consent to search his truck.
Even if, as defendant testified, he did not consent to the search, the officers were authorized to search the vehicle incident to the valid warrantless arrest. The police may search the passenger compartment of an automobile in a search incident to the arrest when the automobile's occupant is arrested. State v. Becnel, 04-1266 (La.App. 5 Cir. 5/31/05), 904 So.2d 838, 853. This exception applies whether the individual remains in the vehicle or is removed by the police. Thornton v. United States, 541 U.S. 615, 621, 124 S.Ct. 2127, 2131, 158 L.Ed.2d 905 (2004).
Based on the foregoing, we fail to find that the trial court abused its discretion in denying defendant's suppression motion. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in denying the defenses Batson challenges during jury selection.
DISCUSSION
Defendant contends the trial court erred in failing to sustain his Batson challenges, arguing the State systematically used its peremptory strikes to exclude African-Americans from the jury. Defendant points out the State excused five African-American prospective jurors, leaving only one to serve on the jury. Defendant presents arguments as to only three of the excluded jurors: Manuel Stamand, Rita Emmanuel, and Shannon Green. The State argues that prosecutors provided *641 race-neutral reasons for striking those jurors, and that the trial court did not err in denying defendant's Batson challenges.
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of a prospective juror were based on race. The Supreme Court subsequently restated and employed the three-part test in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), and Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).
In State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, 600, the Louisiana Supreme Court, quoting Collins, 126 S.Ct. at 974, set forth the reviewing process for a Batson claim:
A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S., at 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Id., at 97-98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, supra, at 98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 2331-2332, 162 L.Ed.2d 196 (2005). This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, supra, at 768, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834.
In State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291, 319, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006), the supreme court discussed the important part the trial court plays in the jury selection process:
The trial court plays a unique role in the dynamics of a voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. As a result, the trial court's evaluation of discriminatory intent is entitled to great deference by reviewing courts. (citations omitted).
The prospective jurors identified in the record as African-Americans are Addie Jenkins, Fred Savage, Jr.,[3] Larry Haw, Jr., Colonel White, Manuel Stamand, Shannon Green, and Rita Emmanuel. Jenkins was excused by the trial court for *642 cause without defense objection. Mr. Haw was among the six members of the first voir dire panel who were seated on the jury. He was ultimately the only African-American who served on the jury.
The State used a peremptory challenge to excuse Fred Savage from the second panel of prospective jurors. Defense counsel did not object to the peremptory challenge, but noted for the record that Savage is African-American. When the State excused Colonel White from the second panel, defense counsel said, "I'm going to object. He's an African American male. He answered everything properly." The prosecutor responded, "No. He has a son in jail for drugs who's innocent." Defense counsel countered, "But he said he could be fair and would disregard that." The trial judge did not comment or rule on defendant's objection.
Manuel Stamand was included in the third voir dire panel. He stated he works as a combination fitter with Northrop Grumman. He is unmarried, and has three daughters. He said he has never served on a jury before, he has never been convicted of a criminal offense, and he has no friends or relatives in law enforcement.
When the State excused Mr. Stamand, defense counsel objected, and moved the court to require a race-neutral reason. The judge responded, "All right. This is the third out of four African Americans, so all right. I'm going to ask for a reason." The following exchange ensued:
Mr. Dohre [prosecutor]:
Mr. Stamand? He shook his head twice during the voir dire. And I put, in relations to when Mr. Netterville [defense counsel] asked him aboutwhen Netterville gave the example of if a man confessed that, yeah, I was going to sell this marijuana, then that would be evidence of possession with intent to distribute marijuana. That was the one time. Well, sir, we don't have such a thing in this case; he was shaking his head like that's what he needed.
Two, the other time he shook his head was when Mr. Netterville was giving the example of what a lot of marijuana could be, and when he said, when he was talking about the difference between and I don't have the exact amount  but he was talking about the difference between a small amount and a large amount, it was when he said the large amount that he started shaking his head, not related to the small amount.
In this particular case, it's not a situation where there's pounds of marijuana. And that's what he was shaking his head to. In this particular case, it's more of the packaging and more of the marijuana was kept and the paraphernalia issues, but it's not pounds of marijuana, and that's when he was shaking his head too. For those two reasons, I don't have a confession in this case, which is onethe first time he shook his head; and the other time was when he was talking about pounds of marijuana indicative of what weight it would be.
* * * *
Mr. Netterville [defense counsel]:
Judge, both of those examples I used were made to go to extremes so that people would agree so he would understand what the law is. And Mr. Stamand was not the only person shaking his head in an affirm demeanor. Other people were agreeing with me, because that's the way it was set up, butto make an illustration.
I'm just saying, judge, there's no really reason to cut this man. I know there's been studies and stuff about whether or not the district attorney's office cuts more African Americans disproportioning *643 them, they might be. But if they did the same study they show on the defense attorneys probablyI don't know why people disproportion the blacks, but he (sic) point is it's up to the courts to enforce that. I'll never blame the DAs office for what they're doing, but the courts need to enforce it. And you're in a court has to enforce it, and the only way for it to enforce it is say, well, no, he's going to be on the jury. He's a black man and he's going to be on the jury. It'sI'm not persuaded that that's strong enough to cut him off, so we're going to put him on the jury. And until that happens, we're going to have this proportion of white jurors.
The Court:
All right. I understand that I'm the gatekeeper, but it's not strong enough to keep him off or strong enough to keep him on. It's notthe later standard is that they can give any articluable reason, and that's the way whichgoes a long way from when Batson started out, the latest cases, articulable reason, whether they are great reasons or not so great reasons. It's an articulable reason, so it's the motion of a Batson is denied.
Mr. Netterville:
We'd not our objection.
There were ten seated jurors when the fourth panel of prospective jurors was called. That panel included Shannon Green and Rita Emmanuel. Ms. Green stated she lives in Westwego. She is unmarried, and has no children. She is employed by the Jefferson Parish School Board as a parent educator. She has no friends or relatives who work in law enforcement. Green said she has cousins who have been convicted of drug charges, but that would not affect her ability to give the State a fair trial.
When the prosecutor asked whether any of the prospective jurors had a problem with the fact that the law imposed a greater punishment on those who were in possession of narcotics within 1,000 feet of a school, Ms. Green raised her hand. She said she would take such an offense seriously because she worked for the school board.
When the prosecutor excused Ms. Green, defense counsel made a Batson challenge. He argued that the State used four of its first six peremptory challenges to strike African-Americans. The judge asked the prosecutor for a race-neutral reason. The prosecutor gave as his reason for cutting Green that her cousins were convicted of drug charges. Defense counsel countered that Green said she would be tough on drugs near a school because she worked for the school board. The judge ruled, "[A] relative convicted on a charge is an articulable reason, which has been allowed by the court, so that objection is denied."
Ms. Emmanuel stated she is unmarried and has one daughter and one grandson. She is employed by Bank of Louisiana as a customer service representative. Her daughter is a deputy criminal sheriff in Orleans Parish, but she can still be fair to both the State and the defense. She said her younger brother has a drug problem, but that she can still be a fair juror.
When the prosecutor asked whether anyone on the panel would need testimony from a witness other than police officers in order to convict, Ms. Emmanuel raised her hand. She said that considering where the incident occurred, "it seems like some other citizens would be seen or there would be somebody that could say something other than just the arresting officers." After further discussion of the issue, the prosecutor asked Ms. Emmanuel, "Would you still think that there should be police *644 more than just police officers who can testify?" She responded, "For the charge that you have, yes."
When the prosecutor excused Ms. Emmanuel, the following discussion took place:
The Court:
All right, now, this is
Mr. Dohre:
Judge, she's the one who does say that she would require more than police officer testimony, and given the situation that it occurred within a school. I don't have no other but police officer testimony. She said that. That's what she thought. That goes directly against my case.
Mr. Netterville:
What she said was that that would be an important facet of the case, as to whether or not somebody else saw him selling drugs from the area. Her daughterand anyway, she said she couldn'tsaid nothing about she could not be fair. Her daughter is a New Orleans criminal [sic] Sheriff's Deputy, Judge.
So now we've got the State  1, 2, 3, 4, 5, 6now it's six African Americans that has come in front of it. The State has used five of six challenges to cut those people. And Judge, Batson is never going to be enforced if the trial court doesn't start enforcing it.
The Court:
No. Don'tdon't
Mr. Netterville:
Judge  wait
The Court:
No. No, don'tyou needyou
Mr. Netterville:
The trial court needs to say, Judge, and I'm askingwhat I'm asking you to doI want to make it plain on Record I'm asking the Court to say, no, sir, I'm putting these people on the jury. Of all the trials I've had around here, I've only had one judge to do it.
The Court:
And I'm not doing it on this one, because that isthat is the basis for peremptory challenge, the articulable basis, and there was a number of questions about that issue. That's a very serious issue.
If that was a white juror, and said the same instances and threw them off, there would be no question. It happens to be a black juror. So denied. Next.
Mr. Netterville:
We'd note our objection, Judge.
In considering defendant's Batson objections, the trial judge did not make explicit findings as to the first step in the three-part analysis. Instead, he immediately asked the prosecutor for race-neutral explanations for the State's peremptory challenges. When the trial judge does not rule on whether a defendant asserting a Batson challenge met his burden to establish a prima facie case of racial discrimination, but rules on the ultimate question of intentional discrimination after the state offers a race-neutral explanation for the peremptory challenge, the issue of whether the defendant made a prima facie showing becomes moot. State v. Robinson, 04-964 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1124. The question in this case, then, is whether the State's explanations for its peremptory challenges were in fact race-neutral.
Defendant argues the trial court erred in finding the reasons the State gave for excusing Manuel Stamand, Rita Emmanuel, and Shannon Green were raceneutral. He maintains the State's reasons were a camouflage for racial bias. The prosecutor gave, as his first reason for *645 striking Mr. Stamand, that Stamand shook his head when defense counsel explained a confession by the defendant was not necessary to prove intent to distribute, as if he did not agree with the law on that point. As his second reason, the prosecutor said Stamand shook his head when defense counsel spoke about the significance of a small amount of marijuana versus a large amount, as if he believed a small amount of marijuana cannot be indicative of intent to distribute.
Defendant argues there is nothing in the record to show Mr. Stamand actually shook his head as the State claimed. But the trial judge, who was in the best position to observe the prospective jurors, accepted the prosecutor's claim. Furthermore, the State's reason for exercising a peremptory challenge will qualify as race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 956, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In this instance, there is no discernable discriminatory intent in the State's explanation. LSA-C.Cr.P. art 798(1) lists a juror's bias against the enforcement of a statute as a basis upon which the State may challenge a juror for cause. It follows, then, that Mr. Stamand's apparent disagreement with the law in this case was a valid race-neutral reason for excusing him on a peremptory challenge.
The trial court did not err in denying defendant's Batson challenge as to Ms. Green, whom the State excused because her cousins had been convicted on drug charges. That a venire member's relative has been incarcerated for a drug offense has been found to be a valid nondiscriminatory basis for exercise of peremptory challenge in a drug prosecution. See, State v. Harrison, 32,643 (La.App. 2 Cir. 10/27/99), 743 So.2d 883, 888, writ denied, 99-3352 (La.6/30/00), 765 So.2d 327.
The trial court did not err in denying defendant's Batson challenge as to Ms. Emmanuel. The State struck Ms. Emmanuel because she said she would require testimony other than that of a police officer in order to convict, and all of the State's witnesses were police officers. This is another instance of the juror's inability to follow the law.
Based on the foregoing, we fail to find that the trial court erred in denying defendant's Batson challenges as to prospective jurors Stamand, Green, and Emmanuel. This assignment of error is without merit.
ERRORS PATENT DISCUSSION
The Defendant requests an errors patent review. This Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920 regardless of whether defendant makes such a request. State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review of the record reveals no errors patent which require corrective action.
DECREE
Accordingly, for the reasons assigned herein, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Note that defendant's first name is alternately spelled "Gardener" and "Gardner" throughout the appeal record, whereas it was spelled "Gardner" in defendant's pre-trial writ application. At the suppression hearing below, defendant stated that "Gardner" is the correct spelling of his name.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] This juror is referred to as "Selvage" or "Salvage" in the trial transcript, and as "Savage" in the minute entry.