SUSAN M. CHEHARDY, Judge.
 

 1 ¡>This is defendant’s appeal from his convictions for second degree murder after his second trial. In 1998, defendant, Lawrence Jacobs, Jr., was convicted of first degree murder and sentenced to death.
 
 [1]
 
 
 *681
 
 On direct appeal, the Louisiana Supreme Court reversed defendant’s conviction and sentence and remanded the matter for a new trial.
 
 [2]
 

 In
 
 Jacobs I,
 
 the Louisiana Supreme Court reversed defendant’s conviction because of the trial judge’s erroneous denial of two of defendant’s challenges for cause. The supreme court described the denial of cause challenges as “the most blatant grounds” for reversal, but also noted serious questions regarding potential
 
 Batson
 
 violations and reminded the trial court “of its unique and integral role in the dynamics of voir dire and [cautioned] it to be especially sensitive to the alleged | ¡¡racially discriminatory use of peremptory challenges.”
 
 [3]
 
 The supreme court reiterated the importance of the trial judge’s role when
 
 Batson
 
 challenges are made:
 

 The issue of purposeful racial discrimination in the use of peremptory challenges is a matter of utmost seriousness affecting not only the trial itself, but the perceived fairness of the judicial system as a whole. The trial judge observes first-hand the demeanor of the attorneys and venirepersons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold record.
 

 State v. Jacobs,
 
 789 So.2d at 1283, n. 2.
 
 [4]
 

 Chief Justice Kimball, writing for the court, admonished the trial judge to “properly address
 
 Batson
 
 challenges when made, by ruling on whether a
 
 prima facie
 
 case of discriminatory intent has been made or by requiring race-neutral reasons for the strikes.”
 
 [5]
 
 In closing, Justice Kim-ball reiterated that “[i]t is essential that the trial judge not only control the proceedings, but that he guide the attorneys through the necessary steps involved in a
 
 Batson
 
 challenge, in order to ensure the integrity and fairness of the jury selection process.”
 
 [6]
 

 On September 12, 2002, the Jefferson Parish grand jury indicted defendant again for first degree murder and defendant pled not guilty.
 
 [7]
 
 On May 13, 2005, the Jeffer
 
 *682
 
 son Parish District Attorney’s Office amended the original 1996 indictment (not the 2002 indictment) to reduce the charges against defendant to two counts of second degree murder, in violation of La. R.S. 14:30.1.
 
 [8]
 
 Defendant was arraigned on the amended indictment on August 17, 2006, and he pled not guilty.
 

 |4On August 21, 2006, defendant’s second trial began.
 
 [9]
 
 On August 25, 2006, defendant was found guilty as charged on both counts by a unanimous twelve-person jury. On October 4, 2006, the trial court, after denying defendant’s motions for new trial and post-verdict judgment of acquittal, sentenced defendant to two consecutive life sentences at hard labor, without the benefit of parole, probation, or suspension of sentence.
 

 We have thoroughly reviewed the record at hand. We adopt the Louisiana Supreme Court’s previous recitation of the facts because it accurately reflects the details disclosed in the current record.
 
 [10]
 

 On the morning of October 31, 1996, forty-five-year-old Nelson Beaugh and his seventy-year-old mother, Della Beaugh, were fatally shot in Nelson’s home in Marrero, Louisiana. Nelson’s mother-in-law discovered their bodies when she arrived to clean the house that same morning. Both victims had been shot in the head.
 

 An investigation led to the issuance of an arrest warrant for the defendant, Lawrence J. Jacobs, Jr., who was sixteen years old at the time.... When the police contacted the defendant’s father, Lawrence Jacobs, Sr., Mr. Jacobs notified the case agent, Lieutenant Snow, that his son had run away from home two months earlier, but that he would assist in locating him. Thereafter, Mr. Jacobs discovered that the defendant had fled to Jackson, Mississippi, where they had relatives. Mr. Jacobs picked his son up in Jackson, drove him back to Louisiana, and surrendered him to Lt. Snow.
 

 On appeal, defendant asserts sixteen assignments of error.
 
 [11]
 
 After careful scruti
 
 *683
 
 ny, we find serious merit in defendant’s claim that the trial judge failed to 1 Rproperly address the prosecution’s discriminatory use of peremptory challenges when he raised his claims during voir dire. Accordingly, the United States and Louisiana Constitutions mandate that we set aside defendant’s convictions and sentences and order a new trial.
 

 On appeal, defendant argues that the trial court erred in denying his challenge pursuant to
 
 Batson v. Kentucky,
 

 [12]
 

 after the State used seven of eight peremptory challenges to strike six black prospective jurors and one Hispanic prospective juror from two separate voir dire panels. Defendant contends that his
 
 Batson
 
 claims are supported by statistical evidence of racial discrimination; evidence of the prosecution’s disparate questioning of black and white jurors; evidence of the prosecution’s failure to conduct meaningful voir dire on matters of alleged concern and that formed the basis for its peremptory strikes; and evidence of the prosecution’s failure to strike white jurors who offered similar responses. Defendant also asserts the trial court merely “rubber-stamped” the race-neutral explanations given by the State and failed to conduct the analysis required to determine whether the offered explanations were pretextual to purposeful discrimination. We agree.
 

 A defendant has the right to full voir dire examination of prospective jurors.
 
 [13]
 
 La. Const. Art. I, § 17. The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause, and to se-curej^information for an intelligent exercise of peremptory challenges.
 
 [14]
 
 The trial court must give “wide latitude” to the defendant.
 
 [15]
 

 Furthermore, an accused has a constitutionally guaranteed right to peremptorily challenge jurors. La. Const. Art. I, § 17. La.C.Cr.P. art. 788 provides:
 

 
 *684
 
 A. After the examination provided by Article 786, a prospective juror may be tendered first to the state, which shall accept or challenge him. If the state accepts the prospective juror, he shall be tendered to the defendant, who shall accept or challenge him. When a prospective juror is accepted by the state and the defendant, he shall be sworn immediately as a juror. This Article is subject to the provisions of Articles 795 and 796.
 
 [16]
 

 B. If the court does not require tendering of jurors, it shall by local rule provide for a system of simultaneous exercise of challenges.
 

 When, however, the jury panel is not sworn until all individual jurors and alternates have been selected,
 
 [17]
 
 peremptory challenges may be exercised even after tendering of jurors under La.C.Cr.P. art. 788(A).
 
 [18]
 
 In other words, in Louisiana, peremptory challenges are exercisable at any time before the entire jury panel is sworn. Backstriking is the term for a party’s exercise of a peremptory challenge to strike a prospective juror after initially accepting him.
 
 [19]
 

 |7The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges.
 
 [20]
 
 The
 
 Batson
 
 court established a three-step analysis triggered by a defendant’s claim that the State’s peremptory challenge of a prospective juror was based on race.
 

 First, the trial court must determine whether the defendant has made a
 
 prima facie
 
 showing that the prosecutor exercised a peremptory challenge on the basis of race.
 
 [21]
 
 Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation to the trial judge for striking the juror in
 
 *685
 
 question.
 
 [22]
 
 This second step “does not demand an explanation that is persuasive or even plausible;” as long as the reason is not inherently discriminatory, it suffices.
 
 [23]
 
 Third, the trial court must then determine whether the defendant has established purposeful discrimination.
 
 [24]
 
 This third step is when the prosecution’s implausible explanations “may (and probably will) be found [by the trial judge] to be pretexts for purposeful discrimination.”
 
 [25]
 

 In recent years, the United States Supreme Court has reaffirmed
 
 Batson’s
 
 three-part test in
 
 Miller-El v.
 
 Dretke,
 
 [26]
 
 and
 
 Snyder v.
 
 Louisiana,
 
 [27]
 
 In
 
 Miller-El,
 
 the defendant was tried and convicted of capital murder and sentenced to death. During jury selection, state prosecutors used peremptory strikes against ten qualified black venire members. The defendant objected that the strikes were based on race and could not be presumed legitimate. At the hearing on the issue, the prosecutor gave his proffered race-neutral justifications for the strikes, which |sthe trial judge accepted as “completely credible [and] sufficient” for a finding of “no purposeful discrimination.”
 
 [28]
 

 In that case, the venire panel started with 108 people, twenty of whom were black. Of those twenty, only one black person served on Miller-El’s jury.
 
 [29]
 
 Although nine prospective jurors were excused for cause or by agreement, the remaining ten were peremptorily struck by the prosecution. The prosecutors, thus, used their peremptory strikes to exclude 91% of the eligible African-American veni-re members.
 
 [30]
 
 The
 
 Miller-El
 
 court noted, “Happenstance is unlikely to produce this disparity.”
 
 [31]
 

 The
 
 Miller-El
 
 court further opined that “side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve” was even “[m]ore powerful than ... bare statistics.”
 
 [32]
 
 The Supreme Court noted that “[i]f a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at
 
 Batson’s
 
 third step.”
 
 [33]
 
 For instance, in
 
 Miller-El,
 
 the prosecutor peremptorily struck a black prospective juror, who was not opposed to the death penalty, but accepted white prospective jurors who were not favorable to the death penalty.
 
 [34]
 
 The United States Supreme Court discussed the disparity as follows:
 

 In sum, nonblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to im
 
 *686
 
 pose a death sentence were not questioned further and drew no objection, but the prosecution expressed apprehension about a black juror’s belief in the possibility of reformation even though [that juror] repeatedly stated his approval of the death penalty and testified that he could impose it according to state legal standards even when the alternative sentence 19of life imprisonment would give a defendant ... the opportunity to reform.
 

 Miller-El,
 
 545 U.S. at 245, 125 S.Ct. at 2328. The
 
 MiUer-El
 
 court reiterated the trial judge’s responsibility to assess the plausibility of the prosecutor’s proffered race-neutral reason “in light of all evidence with a bearing on it.”
 
 [35]
 

 More recently, in
 
 Snyder v. Louisiana,
 
 the United States Supreme Court reemphasized the trial court’s pivotal role under the third step of
 
 Batson:
 
 to carefully scrutinize the plausibility of the prosecutor’s explanation for a peremptory strike.
 
 [36]
 
 The Snyder Court explained that, in
 
 Bat-son’s
 
 third step, the trial court is required to evaluate the prosecutor’s credibility by assessing “not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demean- or can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.”
 
 [37]
 

 The
 
 Snyder
 
 court stressed that “all of the circumstances that bear upon the issue of racial animosity must be consulted” in determining whether the explanation given for the strike is convincingly race-neutral.
 
 [38]
 
 When the record does not support the prosecutor’s proffered explanation or reflects that the proffered explanation is implausible, an inference of discriminatory intent exists that sufficiently demonstrates a
 
 Batson
 
 violation.
 
 [39]
 

 The
 
 Snyder
 
 court recognized the trial judge’s great discretion in evaluating discriminatory intent in a
 
 Batson
 
 challenge based on the trial judge’s first-hand observations of a juror’s demeanor, noting that his observations often form the basis for race-neutral reasons for peremptory challenges.
 
 [40]
 
 Finally, the Supreme |inCourt noted that, on appeal, a trial court’s ruling on the issue of discriminatory intent must be sustained, unless it is clearly erroneous.
 
 [41]
 

 In Snyder,
 
 which was tried by the same trial judge who presided over the instant case, the defendant was convicted of first degree murder and sentenced to death. The defendant alleged that the prosecutor had violated his constitutional rights by peremptorily striking two black jurors for non-race neutral reasons.
 
 [42]
 

 The United States Supreme Court focused its
 
 Batson
 
 analysis on only one of the prospective jurors, Mr. Brooks.
 
 [43]
 
 The prosecutor offered two race-neutral rea
 
 *687
 
 sons for the peremptory strike of Mr. Brooks: (1) that he appeared very nervous, and (2) that he was concerned about a conflicting obligation and might render a lesser verdict to avoid a penalty phase in order to shorten his jury service.
 
 [44]
 
 The trial judge granted the challenge without explanation or comment.
 

 In reviewing the prosecutor’s proffered explanations, the United States Supreme Court rejected the prosecutor’s first proffered reason because the trial judge did not make a determination regarding Mr. Brooks’ demeanor on the record.
 
 [45]
 
 The Supreme Court examined the prosecutor’s second proffered reason and concluded that, even under a deferential standard of review, the explanation failed.
 
 [46]
 
 It noted that Mr. Brooks’ concern about missing his student-teaching obligation was dispelled when the school dean was contacted during voir dire, and assured the Court that Mr. Brooks would not be penalized for missing a few days of student-teaching for jury service. The Supreme Court remarked that Mr. Brooks ^expressed no further concerns about his obligation and the prosecutor chose not to further question Mr. Brooks about the matter.
 
 [47]
 

 The United States Supreme Court also determined that the prosecutor’s claim that Mr. Brooks would be motivated to And the defendant guilty of a lesser offense to obviate the penalty phase was highly speculative. The Supreme Court observed that, even if Mr. Brooks favored a quick resolution, it would not have necessarily led him to return a lesser verdict, especially if the majority of jurors initially favored a verdict of guilty as charged. In sum, the high court found that the prosecutor’s second proffered race-neutral reason for striking Mr. Brooks was suspicious.
 
 [48]
 

 After determining the reason was suspicious, the Supreme Court further evaluated the plausibility of the prosecutor’s explanation. The high court found that the implausibility of the prosecutor’s stated reason was “reinforced by the prosecutor’s acceptance of white jurors who disclosed conflicting obligations that appeared] to have been at least as serious as Mr. Brooks.”
 
 [49]
 
 The Supreme Court observed that the prosecutor further questioned one white juror, who had a conflicting obligation, in an attempt to elicit assurances that he would be able to serve despite his obligations, but declined to further question Mr. Brooks.
 
 [50]
 
 The
 
 Snyder
 
 court, thus, held that the prosecutor’s peremptory challenge of Mr. Brooks reflected discriminatory intent and violated the defendant’s right to equal protection as enunciated in Batson.
 
 [51]
 

 We now apply the reasoning of
 
 Batson,
 
 and its progeny,
 
 Miller-El
 
 and
 
 Snyder,
 
 to the facts of this case. During voir dire, the defendant objected twice to |12the prosecution’s peremptory strikes of non-white jurors alleging a pattern of race-related strikes. At both times, the prose
 
 *688
 
 cutor immediately offered to give race-neutral reasons for his challenges. The trial judge responded, “Why don’t you do it,” but did not make an explicit ruling that defendant had established a
 
 prime facie
 
 case of racial discrimination.
 

 When the trial judge fails to rule on whether a defendant asserting a
 
 Batson
 
 challenge met his burden to establish a
 
 prima facie
 
 case of racial discrimination, but rules on the ultimate question of intentional discrimination, the issue of whether the defendant made a
 
 prima facie
 
 showing becomes moot.
 
 [52]
 
 Because the trial judge ruled on the ultimate issue of racial discrimination, the question of whether the defendant made a
 
 prima facie
 
 showing is moot.
 

 In the interest of thorough analysis, however, we will discuss the
 
 Batson
 
 objections that defense counsel raised after the second and third venire panels. First, defense counsel pointed out that, after the second panel, the prosecutor used peremptory strikes to exclude 100% of the black prospective jurors and 100% of the Hispanic prospective jurors who had been interviewed.
 

 According to the record, the entire jury venire was comprised of forty-eight people, eight of whom were black. Statistically, black prospective jurors represented a little less than 17% of the jury pool. The first panel of prospective jurors consisted of fifteen people, fourteen of whom were white and one of whom was Hispanic. The State did not use any peremptory strikes immediately after the first jury panel.
 

 The second panel of prospective jurors, which was voir dired on the second day of jury selection, consisted of fourteen people, nine of whom were white and five of whom were black. The State used seven peremptory strikes after the second jury panel, five of which were used to exclude the five prospective black | ^jurors and one of which was used to “backstrike”
 
 [53]
 
 the Hispanic juror from the first panel.
 

 Statistically, the record shows that, after questioning the second jury panel, the prosecution peremptorily challenged 100% of the black prospective jurors and 100% of the Hispanic prospective jurors who had been interviewed. In contrast, only one of the State’s seven peremptory challenges had been used to strike a white prospective juror after twenty-three white prospective jurors had been interviewed, which means that the State challenged less than 4% of the white prospective jurors.
 

 The third panel of prospective jurors was comprised of thirteen people, two of whom were black. After the third panel of prospective jurors was questioned, the State made its last peremptory strike against one of the two remaining black prospective jurors. The other black prospective juror ultimately served on the jury. From a purely statistical perspective, the State used seven of eight, or 87%, of its peremptory strikes to challenge nonwhite prospective jurors, where non-whites comprised less than 19% of the prospective jurors.
 
 [54]
 
 The
 
 Miller-El
 
 court, faced with a similar situation, noted, “Happenstance is unlikely to produce this disparity.”
 
 [55]
 
 
 *689
 
 Likewise, we find it unlikely that the disparity in the present case was pure chance.
 

 More importantly, in our case, defense counsel pointed out that the prosecutor asked different questions when there were black prospective jurors on the venire panel. For instance, the prosecutor asked venire panels with non-white prospective jurors if they knew anyone in jail but did not pose that question to the panel with only white prospective jurors. Additionally, defense counsel noted that | uthe prosecutor only discussed and questioned the panels with non-white prospective jurors about the fact that defendant potentially faced a life sentence.
 

 Under
 
 Batson,
 
 once the defendant makes his
 
 prima facie
 
 showing of discrimination, the burden shifts to the prosecutor to present a race-neutral explanation to the trial judge for striking the juror in question.
 
 [56]
 
 This second step “does not demand an explanation that is persuasive or even plausible;” as long as the reason is not inherently discriminatory, it suffices.
 
 [57]
 

 In an attempt to comply with the second step of
 
 Batson,
 
 the prosecutor in our case volunteered race-neutral reasons for each of the seven jurors that he struck. On appeal, defendant discusses all seven prospective jurors. We will address the defendant’s
 
 Batson
 
 challenge with respect to select prospective jurors: Eric Hughes and Leola Florence.
 
 [58]
 

 During jury selection, Mr. Hughes, a Hispanic male on the first venire panel, was accepted by the State and the defendant after voir dire on the first day. The next day, when the prosecutor and defense
 

 counsel were discussing challenges at the bench after interviewing the second jury panel, the prosecutor stated to the trial court that he had heard “a juror on the first panel,” later identified as Eric Hughes, was asking to be excused from jury duty due to a medical condition. The trial judge responded, “Yeah, there is a juror on the first panel that’s asking to be excused. He said he was going to have his doctor fax something over, but I don’t think we’ve received it yet.”
 

 The trial judge further explained that he had been given information from a deputy that the juror had some kind of muscular problem and had seen his chiropractor, who may or may not be “sending us something.” The trial judge noted that he did not intend to excuse Mr. Hughes based on the information he had.
 

 | ^Defense counsel inquired about the source of the information, noting that she had not been apprised of the matter. The prosecutor replied, “I heard it from somebody. I don’t know. I don’t even remember where I heard it from.” Next, the prosecutor asked defense counsel to consent to excusing Mr. Hughes for cause but defense counsel refused based on the lack of information. Immediately thereafter, the prosecutor exercised a peremptory challenge to “backstrike” Mr. Hughes from the jury.
 

 When defense counsel noted that Mr. Hughes’ excusal showed a pattern of discrimination against non-white jurors in the prosecution’s use of peremptory challenges, the prosecutor responded that he did not know Mr. Hughes was Hispanic.
 
 *690
 
 The prosecutor subsequently admitted that he knew Mr. Hughes had been born “in Latin America or some Latin continent.”
 
 [59]
 
 The prosecutor stated he struck Mr. Hughes “because it came to the Court’s attention that he did not want to sit.” The prosecutor opined, that most jurors who do not want to serve usually take it out on the State, and, thus, he felt Mr. Hughes would be adverse or hostile towards the State.
 

 Defense counsel countered by arguing the State was drawing on information outside the record and questioned the source of the State’s information. The prosecutor responded:
 

 Judge, someone mentioned that he did not want to sit. That’s been confirmed by the bailiff in open court with Your Honor. What is the big deal? She was told about it. She knows about it. What’s the harm? What’s the foul?
 

 Defense counsel stated that no one had talked to Mr. Hughes about the information and, thus, the State’s explanation that Mr. Hughes did not want to sit or might hold jury service against the State was unsupported by the record on voir dire. The trial judge remarked:
 

 11(iTlie only thing I can say for certain is my bailiff brought it to my attention that Mr. Hughes had expressed — actually my secretary also brought it to my attention that he had called in and expressed the fact that he had to see a doctor or a chiropractor for some type of muscular thing and I don’t know whether it’s his neck or his back or what part of his body, but that, you know, he had hoped to get some type of note from the doctor that he was hoping would excuse him from serving. It was brought to my attention but I never acted on it in any way, never expressed it to anyone and I was just waiting to see how the selection process went today before I brought it to anyone’s attention, really, because I thought there was a chance he might get back-struck like some of the other jurors have gotten back-struck, so that’s where we stand with him. (Emphasis added).
 

 Without any further comments, the trial judge apparently accepted the prosecutor’s race-neutral explanation for baekstriking Mr. Hughes and denied the defendant’s
 
 Batson
 
 challenge with respect to Mr. Hughes.
 
 [60]
 

 As the United States Supreme Court noted in Miller-El,
 
 [61]
 
 the third step of a
 
 Batson
 
 challenge requires the trial judge to assess the plausibility of the prosecutor’s proffered reason in light of all evidence bearing on it. The
 
 Snyder
 
 court, focusing more acutely on the third step of the
 
 Batson
 
 inquiry, stressed the importance of the trial judge’s independent assessment of the plausibility of the proffered race-neutral explanation based on the prosecutor’s credibility and the prospective juror’s demeanor.
 

 Here, the prosecutor challenged Mr. Hughes based on a “medical condition,” which was never confirmed. Our review reveals that the record is devoid of any evidence from Mr. Hughes about his condition. We are, thus, unclear how the trial judge was able to assess the plausibility of the proffered race-neutral explanation since the record does not contain one scin
 
 *691
 
 tilla of evidence about Mr. Hughes’ medical condition.
 

 Secondly, after learning of Mr. Hughes’ alleged “medical condition,” the prosecution did not recall him to ask him any questions about his medical needs or 117his condition’s effect on his ability to serve. In fact, the prosecutor did not ask questions regarding medical conditions of any voir dire panel. We are at a loss to determine how the trial judge was able to assess the plausibility of the prosecutor’s proffered race-neutral explanation based on his credibility and the juror’s demeanor when the prosecutor did not pose a single question about medical conditions to the entire venire.
 

 Furthermore, when faced with direct evidence that a white prospective juror may be in medical distress, the prosecutor did not inquire about that juror’s medical condition. Specifically, during voir dire of the first jury panel, a white prospective juror, Ms. Jackye Thibodeaux, interrupted the trial judge, prosecutor and defense counsel during a bench conference to say, “I’m sorry, but when I left the house this morning I didn’t know I was going to be gone 12 hours. I’m a diabetic. I can’t do this much longer. I’m sorry, and I’m already kind of dizzy.”
 

 Neither the prosecutor (nor defense counsel) asked Ms. Thibodeaux whether her diabetes would interfere with her ability to serve on the jury. In fact, even though Ms. Thibodeaux volunteered information regarding her diabetes’ adverse effect on her capability to serve on a jury, the State ultimately accepted Ms. Thibo-deaux to serve on the jury.
 

 “The failure to ask undermines the persuasiveness of the claimed concern.”
 
 [62]
 
 Our Louisiana Supreme Court has also observed that “although there is no requirement that a litigant question a prospective juror during voir dire, the jurisprudence holds that the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence that the explanation is a sham and a pretext for discrimination.”
 
 [63]
 

 11sAfter reviewing the voluminous record as a whole, we seriously doubt the sincerity and validity of the proffered race-neutral reason where, as here, the prosecutor failed to further inquire into Mr. Hughes’ “medical condition,” failed to ask any other jurors about relevant medical conditions, and accepted Ms. Thibodeaux, for jury service, without questioning. In light of the record before us, we find that the prosecutor’s proffered explanation for striking Mr. Hughes was implausible and strongly infers discriminatory intent. Accordingly, we find that the trial judge erred in determining that the prosecutor’s explanations for striking Mr. Hughes were convincingly race-neutral. Based on the foregoing, we hold that the trial court erred in denying defense counsel’s
 
 Batson
 
 challenge as to Mr. Hughes.
 

 “The Constitution forbids striking even a single prospective juror for a discriminatory purpose.”
 
 [64]
 
 A single strike based upon race supports a
 
 Batson
 
 claim and requires reversal no matter how ably the prosecution has defended the other strikes.
 
 [65]
 
 Accordingly, we reverse defendant’s convictions and sentences and order a third trial.
 

 
 *692
 
 Although our inquiry could stop here, we further find reversible error regarding African-American prospective juror Leola Florence. With respect to prospective juror Florence, the prosecutor’s proffered reasons for striking her were that she was sleeping during voir dire, she was on a hung jury in a crack cocaine case, and she had received a subpoena in a possible ongoing case in which she may have been the victim. The trial judge accepted the prosecutor’s proffered reasons without comment and simply stated, “[t]he Court is going to deny the defense’s motion.”
 

 |1flBeing a member of a hung jury has been held to be a valid race-neutral reason for a peremptory strike.
 
 [66]
 
 However, in the present case, the prosecutor expressly stated he did not have a problem with hung juries, but rather his concern was that Ms. Florence stated that her jury did not know what to do in the previous case. After Ms. Florence stated that she served on a criminal hung jury, the prosecutor did not inquire about her previous service, her verdict in the prior case, or her understanding of a juror’s task.
 

 “The failure to ask undermines the persuasiveness of the claimed concern.”
 
 [67]
 
 Further, our Louisiana Supreme Court has observed that “although there is no requirement that a litigant question a prospective juror during voir dire, the jurisprudence holds that the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence that the explanation is a sham and a pretext for discrimination.”
 
 [68]
 

 Additionally, the record reflects that the prosecutor treated a similarly-situated white prospective juror differently from the challenged black prospective juror. Deborah Rood, a white prospective juror in the third jury panel, stated that she had served on a hung jury in a criminal matter. When the prosecutor asked Ms. Rood how she voted, she replied that she thought the defendant was guilty. The prosecutor accepted Ms. Rood, who ultimately served on the jury that convicted Mr. Jacobs. Not only does this discrepancy suggest that the prosecutor’s proffered explanation was pretextual, which infers discriminatory intent, but also this disparate treatment is precisely the treatment frowned upon by the United States Supreme Court in
 
 Sny
 
 der.
 
 [69]
 

 | ^^Additionally, the record does not reflect that Ms. Florence was sleeping. Moreover, despite his stated concern, the prosecutor did not engage in any voir dire of Ms. Florence regarding the subpoena she had received. Again, “[t]he failure to ask undermines the persuasiveness of the claimed concern.”
 
 [70]
 

 Under
 
 Miller-El
 
 and
 
 Snyder,
 
 as noted above, the trial judge must independently assess the plausibility of the prosecutor’s proffered reasons. Yet again, the trial judge failed to specifically address the plausibility of any of the prosecutor’s proffered race-neutral explanations, based on the prosecutor’s credibility and the prospective juror’s demeanor. This failure also constituted reversible error.
 

 
 *693
 
 Since we are ordering a third trial in a matter that has been twice reversed for errors in jury selection, we are particularly concerned that voir dire is properly conducted. With this in mind, we feel that a discussion of the strikes of prospective jurors Melanie Auzenne, Ivory Jordan, and Virgie Stevenson is appropriate.
 
 [71]
 
 Considering the totality of the circumstances,
 
 [72]
 
 including that these strikes were based on at least one race-neutral ground, these strikes do not rise to the level of a racial taint that could not be purged.
 
 [73]
 
 These strikes, however, | ^illustrate the need for the trial judge to perform his pivotal role in evaluating the claims as required by
 
 Snyder.
 

 [74]
 

 Regarding Ms. Auzenne, the State offered three reasons for striking her: first, she avoided eye contact with the prosecutor and appearing to be unfriendly to the prosecutor or amenable to the prosecutor’s discussion; second, she was formerly employed at the New Orleans District Attorney’s Office, which has been plagued with problems; and third, he was puzzled when Ms. Auzenne spontaneously volunteered that she had never been accused of anything. During the relevant discussion, the trial judge stated that he also observed Ms. Auzenne’s disinterest but that he could not tell whether she responded differently to either party. The trial judge failed to give his opinion on the prosecutor’s credibility regarding Ms. Auz-enne’s body language.
 
 [75]
 
 Furthermore, the trial judge failed to comment on the prosecutor’s puzzlement over Ms. Auzenne’s comments. In this regard, the trial judge
 
 *694
 
 again abandoned his pivotal role mandated by
 
 Snyder.
 

 Furthermore, the prosecutor’s explanation for striking Ms. Auzenne was based, in part, on the unsupported assumption that her experience with the Orleans Parish District Attorney’s office negatively affected her attitude toward prosecutors. The prosecutor did not ask any questions about her attitude to verify his assumption, which is suspicious and is evidence that the explanation is a sham and a pretext for discrimination.
 

 During voir dire, the State offered four reasons for challenging Mr. Jordan: first, he was the only juror wearing short pants on the first day of voir dire; second, Mr. Jordan was employed at a casino and law-abiding citizens should not get involved in some of the things that occur in a casino; third, Mr. Jordan gave the |2?,prosecutor a disgusted look when Mr. Jordan volunteered the fact that as a crime victim there was a two-hour delay response by the police; and, fourth, the prosecutor had difficulties understanding Mr. Jordan’s speech, which could hinder communications with the other jurors during deliberations.
 

 The trial judge stated that he also observed Mr. Jordan’s disgust over the delayed police response as noted by the prosecutor. The trial judge also observed Mr. Jordan’s reluctance in answering questions, which “could” indicate speech impediment. Here, the trial judge fulfilled his pivotal role and made a credibility determination as to these two of the prosecutor’s reasons regarding the juror’s demeanor. In light of the evidence and testimony presented, we agree that the prosecutor’s race-neutral reasons were worthy of credence.
 

 As to whether Mr. Jordan wore shorts, defense counsel stated that she understood that Mr. Jordan arrived in shorts the preceding day but the prosecutor did not question Mr. Jordan’s attire at that time. The trial judge commented, “I really didn’t notice the short pants.” The trial judge’s comment did not indicate if he believed the prosecutor’s remark on Mr. Jordan’s attire “belied a discriminatory intent,” so, under
 
 Snyder,
 
 the trial judge abandoned his pivotal role regarding this reason.
 

 Finally, the prosecutor also argued that Mr. Jordan was less likely to be a law-abiding citizen because he worked in a casino. The prosecutor did not ask any questions about Mr. Jordan’s character and morals, which is suspicious and is evidence that the explanation is a sham and a pretext for discrimination.
 

 Lastly, with respect to Virgie Stevenson, the State offered the following reasons: first, she slept during the voir dire of the first jury panel while seated as a member of the jury venire audience; second, she taught Sunday School;
 
 [76]
 
 third, she |23had two nephews in jail; and fourth, she found in favor of a plaintiff in a civil case. The trial court accepted the prosecutor’s asserted race-neutral reasons by stating, “[t]he Court accepts the State’s race neutral reasons and finds that the defendant has not carried its [sic] burden of showing purposeful discrimination.”
 

 In Louisiana, courts have found that having relatives in jail is a valid race-neutral reason for exercising a peremptory strike.
 
 [77]
 
 Further, a juror’s involvement in
 
 *695
 
 church activities has been held to be a race-neutral reason for executing a peremptory strike.
 
 [78]
 

 Our concern here is that the striking of Ms. Stevenson on this ground would suggest disparate treatment because the State accepted prospective white juror Lois Oril-lion even though she was also involved in a church group and volunteer work. The record reflects Ms. Orillion was a member of groups, including a church group, that were involved in volunteer and charity work. The State maintained that Ms. Oril-lion differed from Ms. Stevenson because Ms. Orillion voted guilty in a criminal jury trial whereas Ms. Stevenson voted to give the plaintiff money in a civil jury trial.
 
 [79]
 
 The trial judge did not make an evaluation of the State’s reasoning for the record.
 

 More troubling, however, is that the trial judge did not evaluate whether Ms. Stevenson had slept at any time during voir dire. Once again, the trial judge abandoned his pivotal role. Furthermore, during voir dire, the prosecutor did not ask Ms. Stevenson whether she was sleeping or why she found it difficult to stay awake, which again suggests pretext.
 

 In sum, our goal in discussing the trial judge’s inconsistent credibility and demeanor determinations is to caution trial judges to be mindful of their pivotal role, as discussed by the United State Supreme Court in
 
 Miller-El
 
 and
 
 Snyder,
 
 in 124evaluating
 
 Batson
 
 claims. Based on the foregoing, we reverse the defendant’s convictions and sentences and order a new trial.
 

 CONVICTIONS REVERSED; NEW TRIAL ORDERED.
 

 [1]
 

 . Jacobs was originally indicted along with Roy Bridgewater for the first degree murder
 
 *681
 
 of Della and Nelson Beaugh on October 31, 1996. At the time of the offense, Jacobs was 16 years old and Bridgewater was 17 years old. In a separate trial, defendant’s co-perpetrator, Roy Bridgewater, was convicted of first degree murder.
 
 State v. Bridgewater,
 
 00-1529 (La. 1/15/02), 823 So.2d 877,
 
 cert. denied,
 
 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). On appeal, the Louisiana Supreme Court found that the State did not present sufficient evidence to support a first degree murder conviction. As a result, the supreme court vacated the verdict and rendered a judgment of guilty of second degree murder.
 
 Bridgewater,
 
 823 So.2d at 904. On rehearing, the supreme court reversed its ruling, determined the evidence was sufficient to uphold Bridgewater's conviction for first degree murder, and reinstated his conviction.
 
 Bridgewater,
 
 823 So.2d at 914-15. After the United States Supreme Court held that the execution of individuals who were under the age of 18 at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments,
 
 Roper v. Simmons,
 
 543 U.S. 551, 125 S.Ct. 1183, 1198-1199, 161 L.Ed.2d 1 (2005), Bridgewater was resentenced to life imprisonment.
 

 [2]
 

 .
 
 State v. Jacobs,
 
 99-1659 (La.6/29/01), 789 So.2d 1280, 1282-83.
 

 [3]
 

 .
 
 State v. Jacobs,
 
 789 So.2d at 1283, n. 2.
 

 [4]
 

 .
 
 Id.,
 
 citing
 
 State v. Myers,
 
 99-1803 (La.4/11/00), 761 So.2d 498, 502.
 

 [5]
 

 .
 
 Id.
 

 [6]
 

 .
 
 Id.
 

 [7]
 

 . The appellate record does not contain the grand jury return of September 12, 2002, but defendant attached the return to writ applications subsequently filed in this Court. According to U.R.C.A. 2-1.14, ”[a]ny record lodged in this court may, with leave of court, be used, without necessity of duplication, in any other case on appeal or on writ.”
 
 See
 
 
 *682
 

 State v. Bradley,
 
 02-1130 (La.App. 5 Cir. 3/11/03), 844 So.2d 115, 118.
 

 [8]
 

 .Because we are ordering a new trial, we pretermit discussion of the remaining assignments of error, including errors patent. We do note, however, that the record reveals that the State's 2005 amendment of the 1996 indictment is problematic.
 
 See State v. Alo,
 
 06-473 (La.App. 5 Cir. 12/27/06), 948 So.2d 275, 278.
 
 Cf., State v. Domingue,
 
 517 So.2d 346 (La.App. 1 Cir. 1987). Defendant has not challenged the sufficiency of the amended indictment by way of a motion to quash under La.C.Cr.P. arts. 531-532 and a post-verdict attack on the sufficiency of an indictment does not provide grounds for setting aside a conviction, unless the indictment failed to give fair notice of the offense charged, or failed to set forth any identifiable offense.
 
 State v. Cavazos,
 
 610 So.2d 127 (La.1992)(per curiam);
 
 State v. Cedrington,
 
 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 572,
 
 writs denied,
 
 99-0190 (La.6/4/99), 743 So.2d 1249, and 99-0431 (La.6/25/99), 745 So.2d 1182.
 

 [9]
 

 . We note that one of the two prosecutors in defendant’s second trial was also the prosecutor in the first trial.
 

 [10]
 

 .
 
 State
 
 v.
 
 Jacobs,
 
 99-1659 (La.6/29/01), 789 So.2d 1280, 1282.
 

 [11]
 

 . Defendant assigned the following errors: 1) "racial discrimination infected jury selection;” 2) "the trial court erroneously denied defense challenges for cause to impartial jurors;” 3) "removal of counsel of choice is structural error;” 4) “the trial court erred in admitting the gruesome autopsy 'rod' photographs because their prejudicial nature substantially outweighs their probative value;” 5) "the admission of the [Sjtage offense had no independent relevance to this case;” 6) "the trial court erroneously denied Appellant’s proposed instructions on leniency and the rights of the jury;” 7) "there is insufficient evidence of second degree murder;” 8) "the trial court's exclusion of relevant evidence violated Lawrence Jacobs’ right to due pro
 
 *683
 
 cess and a fair trial;” 9) "appellant's statements should have been suppressed;” 10) "the State's reliance on unreliable scientific evidence violates due process;” 11) "defects in the Grand and Petit Jury pool violated the Constitution;” 12) "the State failed to meet its heavy burden to establish that the case had not prescribed;” 13) "the Grand Jury indictment failed to allege all necessary elements;” 14) "the trial court erred in denying Appellant’s Motion to Quash La. C. Cr. P. art. 782 as unconstitutional;” 15) “consecutive life sentences for a Sixteen Year-Old offender convicted of second degree murder violates the Eighth Amendment;” and, 16) "the district court did not have proper jurisdiction over the case.”
 

 [12]
 

 . 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
 

 [13]
 

 . While we will use the term "prospective juror,” we caution court reporters to refrain from using that term in trial transcripts; it is preferable for the court reporter to refer to each prospective juror by their name or juror number. Here, the court reporter referred to some prospective jurors without specifically identifying the juror by name or number. In this record, we were able to discover the prospective juror’s identity after thoroughly examining the entire trial transcript. If we had not been able to discern each juror's identity because the court reporter designated prospective jurors as such, we may have had to remand this matter for correction of the trial transcript. Material omissions from trial court proceedings bearing on the merits of an appeal require reversal.
 
 State v. Boatner,
 
 03-485 (La. 12/3/03), 861 So.2d 149, 153.
 
 See:
 
 La. Const. Art. 1, § 19; La.C.Cr.P. art. 843; La. R.S. 13:961(C);
 
 State v. Cheatteam,
 
 07-272 (La.App. 5 Cir. 5/27/08), 986 So.2d 738, 755.
 

 [14]
 

 .
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364, 376-377
 
 cert. denied,
 
 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
 

 [15]
 

 .
 
 Id., citing State v. Hall,
 
 616 So.2d 664, 669 (La.1993).
 

 [16]
 

 . These articles provide for, among others things, the time and method for challenges based on race or gender, and the removal of a juror after swearing. (Footnote not in the original).
 

 [17]
 

 .
 
 See
 
 La.C.Cr.P. art. 790.
 

 [18]
 

 . "A juror temporarily accepted and sworn in accordance with La.C.Cr.P. art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with La.C.Cr.P. Art. 790.”
 
 State v. Watts,
 
 579 So.2d 931 (La.1991)
 
 citing
 
 La. C.Cr.P. art. 795(b)(1). La.C.Cr.P. art. 795(B)(1) provides that peremptory challenges shall be exercised prior to the swearing of the jury panel.
 

 [19]
 

 .
 
 State v. Plaisance,
 
 00-1858 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193, n. 4,
 
 writ denied,
 
 02-1395 (La. 11/27/01), 831 So.2d 270,
 
 cert. denied, Plaisance v. Louisiana,
 
 538 U.S. 1038, 123 S.Ct. 2084, 155 L.Ed.2d 1071 (2003). While a defendant has a constitutional right under the Louisiana State Constitution to peremptorily strike prospective jurors, there is no constitutional right to backstrike, only a statutory right.
 
 State v. Hailey,
 
 02-1738 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 569. In this case, the reversible error occurred subsequent to the State's use of back-strikes. In fact, the unconstitutional exercise of peremptory challenges when backstriking has resulted in the reversal of a significant number of criminal convictions.
 
 Snyder
 
 v.
 
 State, supra; State v. Coleman, supra; State v. Taylor,
 
 669 So.2d at 376. The nature of back-strikes, which are not always contemporaneous with the party’s voir dire questions and the prospective jurors’ answers, requires the trial judge, in some trials, to recall information, including subtle body language, from days earlier. While it is clear that trial judges must be attentive during voir dire, backstrik-ing asks the judge to see into the future, which proves to be problematic for even the most vigilant jurist. To avoid reversals and the resultant squandering of this state's resources, the ideal scenario would be to eliminate the use of backstrikes.
 

 [20]
 

 .
 
 Batson,
 
 476 U.S. at 96-97, 106 S.Ct. at 1723.
 

 [21]
 

 .
 
 Id.
 

 [22]
 

 .
 
 Batson,
 
 476 U.S. at 97-98, 106 S.Ct. at 1723-24.
 

 [23]
 

 .
 
 Purkett v. Elem,
 
 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)(per curiam).
 

 [24]
 

 .
 
 Batson,
 
 476 U.S. at 98, 106 S.Ct. at 1724.
 

 [25]
 

 .
 
 Purkett v. Elem,
 
 514 U.S. at 768, 115 S.Ct. at 1771.
 

 [26]
 

 .
 
 Miller-El v. Dretke,
 
 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005).
 

 [27]
 

 .
 
 Snyder v. Louisiana,
 
 552 U.S. 472, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008).
 

 [28]
 

 .
 
 Miller-El,
 
 545 U.S. at 237, 125 S.Ct. at 2323.
 

 [29]
 

 .
 
 Id.
 

 [30]
 

 .
 
 Miller-El,
 
 545 U.S. at 240-241, 125 S.Ct. at 2326.
 

 [31]
 

 .
 
 Id.
 

 [32]
 

 .
 
 Miller-El,
 
 545 U.S. at 241, 125 S.Ct. at 2326.
 

 [33]
 

 .
 
 Id.
 

 [34]
 

 .
 
 Miller-El,
 
 545 U.S. at 245, 125 S.Ct. at 2328.
 

 [35]
 

 .
 
 Miller-El,
 
 545 U.S. at 252, 125 S.Ct at 2331.
 

 [36]
 

 .
 
 Snyder,
 
 552 U.S. 472, 128 S.Ct. at 1208.
 

 [37]
 

 .
 
 Id.
 

 [38]
 

 .
 
 Id.
 

 [39]
 

 .
 
 Id.
 
 at 1212.
 

 [40]
 

 .
 
 Id.
 
 at 1208.
 

 [41]
 

 .
 
 Id.
 

 [42]
 

 .
 
 Id.
 

 [43]
 

 . “The Constitution forbids striking even a single prospective juror for a discriminatory purpose.”
 
 Id.
 
 at 1208 (quoting
 
 United States v. Vasquez-Lopez,
 
 22 F.3d 900, 902 (9th Cir.1994), ce
 
 rt. denied,
 
 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994)). The United States Supreme Court, thus, did not discuss whether peremptorily striking the second prospective juror was a violation of
 
 Batson.
 

 [44]
 

 .
 
 Snyder,
 
 552 U.S. 472, 128 S.Ct at 1208.
 

 [45]
 

 .
 
 Id.
 
 at 1209.
 

 [46]
 

 .
 
 Id.
 
 at 1209.
 

 [47]
 

 .
 
 Id.
 
 at 1210.
 

 [48]
 

 . Id. at 1211.
 

 [49]
 

 .
 
 Id.
 
 In his vehement dissent, Justice Thomas notes that the defense did not compare similarly situated white jurors to the challenged black juror in the courts below, but argued the issue for the first time in brief to the United States Supreme Court.
 
 Snyder v. Louisiana,
 
 128 S.Ct. at 1214 (Thomas, J. dissenting, joined by Scalia, J.)
 

 [50]
 

 .
 
 Snyder,
 
 552 U.S. 472, 128 S.Ct. at 1211.
 

 [51]
 

 .
 
 Id.
 
 at 1212.
 

 [52]
 

 .
 
 State
 
 v.
 
 Coleman,
 
 06-518 (La.11/2/07), 970 So.2d 511, 514;
 
 State v. Taylor,
 
 06-558 (La.App. 5 Cir. 7/30/07), 966 So.2d 631, 644,
 
 writ denied,
 
 07-1902 (La.2/1/08), 976 So.2d 717.
 

 [53]
 

 .
 
 See
 
 La.C.Cr.P. art. 795(b)(1);
 
 State v. Taylor,
 
 669 So.2d at 376.
 

 [54]
 

 . According to the record, the venire consisted of 48 people, 9 of whom were referenced as “non-white.”
 

 [55]
 

 .
 
 Miller-El,
 
 545 U.S. at 240-241, 125 S.Ct. at 2326.
 

 [56]
 

 .
 
 Batson,
 
 476 U.S. at 97-98, 106 S.Ct. at 1723-24.
 

 [57]
 

 .
 
 Purkett v. Elem,
 
 514 U.S. at 768, 115 S.Ct. at 1771.
 

 [58]
 

 .Reversal is mandated for even one
 
 Batson
 
 violation.
 
 Snyder,
 
 128 S.Ct. at 1208("The Constitution forbids striking even a single prospective juror for a discriminatory purpose.”).
 

 [59]
 

 . The record reflects Mr. Hughes stated, during voir dire, that he was bom in Central America.
 

 [60]
 

 . Unlike the other six challenged prospective jurors, the trial judge did not expressly state that he accepted the State’s race-neutral explanation as to Mr. Hughes. However, defense counsel later stated on the record that the trial judge had ruled on Mr. Hughes.
 

 [61]
 

 .545 U.S. at 251-52, 125 S.Ct. at 2331.
 

 [62]
 

 .
 
 Miller-El,
 
 545 U.S. at 250, 125 S.Ct. at 2330, n. 8.
 

 [63]
 

 .
 
 Alex v. Rayne Concrete Service,
 
 05-1457 (La.1/26/07), 951 So.2d 138, 154.
 

 [64]
 

 .
 
 Snyder,
 
 552 U.S. 472, 128 S.Ct. at 1208.
 

 [65]
 

 .
 
 State v. Elie,
 
 05-1569 (La.7/10/06), 936 So.2d 791, 796 (citing
 
 Batson,
 
 476 U.S. at 95, 106 S.Ct. at 1722).
 

 [66]
 

 .
 
 See State v. McNeil,
 
 613 So.2d 752, 755-56 (La.App. 4 Cir.1993),
 
 writ granted in part, judgment vacated in part,
 
 623 So.2d 1320 (La.1993).
 

 [67]
 

 .
 
 Miller-El,
 
 545 U.S. at 250, 125 S.Ct. at 2330, n. 8.
 

 [68]
 

 .
 
 Alex v. Rayne Concrete Service,
 
 05-1457 (La.1/26/07), 951 So.2d 138, 154.
 

 [69]
 

 .
 
 Snyder,
 
 552 U.S. 472, 128 S.Ct. at 1211.
 

 [70]
 

 .
 
 Miller-El,
 
 545 U.S. at 250, 125 S.Ct. at 2330, n. 8.
 

 [71]
 

 . We cannot say that the trial judge’s ruling on the individual strikes of African-American prospective jurors Mr. Jordan, Ms. Auzenne, and Ms. Stevenson was "clearly erroneous.”
 
 Snyder v. Louisiana,
 
 128 S.Ct. at 1207 ("[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.”
 
 Hernandez
 
 v.
 
 New York,
 
 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)).
 

 [72]
 

 . " '[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.' ”
 
 Hernandez v. New York,
 
 500 U.S. 352, 363, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991) (quoting
 
 Washington v. Davis,
 
 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)).
 

 [73]
 

 .
 
 Cf. State v. Coleman,
 
 06-518, p. 7 (La.11/2/07), 970 So.2d 511, 515-16. In
 
 Coleman,
 
 the prosecutor’s proffered explanation for the questionable backstrike was the fact the prospective juror had filed a lawsuit against the city alleging institutional discrimination. Immediately thereafter, the prosecutor stated, " 'Defense counsel voir dired on the race issue. There is a black defendant in this case. There are white victims.'”
 
 State v. Coleman,
 
 06-518, p. 6 (La. 11/2/07), 970 So.2d 511, 515 (emphasis omitted). The prosecutor then stated a second reason for striking the prospective juror that was related to his body language. The supreme court recognized that body language had been held to be a valid, race-neutral reason for defeating a
 
 Batson
 
 claim. However, the supreme court found that the prosecutor's statement, quoted above, following his first proffered reason "interjected the issue of race ... and suggested] that the reasons for striking [the prospective juror] were in fact race-related.”
 
 Id.
 
 Under those circumstances, the supreme court held: "Once an inappropriate explanation invoking racial considerations is made, a subsequent, valid reason for exercising the peremptory challenge cannot purge the racial taint.”
 
 Id.,
 
 970 So.2d at 515-516.
 

 [74]
 

 .
 
 Snyder
 
 instructs that the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. Further, race-neutral reasons often involve a juror’s demeanor, which makes the trial court’s first-hand observations even more important. Determinations of credibility and demeanor lie peculiarly within the trial judge’s province.
 
 Snyder,
 
 128 S.Ct. at 1207.
 

 [75]
 

 . A prospective juror’s inattentiveness and overall body language has been held to be a valid race-neutral reason in exercising a peremptory challenge.
 
 See State v. Coleman, 970
 
 So.2d at 515.
 

 [76]
 

 . The prosecutor expressed concern that Ms. Stevenson was "an extremely forgiving soul” and explained he was "afraid that that type of forgiveness would find its way around the facts of this case.” He was impressed that she was a very religious person.
 

 [77]
 

 .
 
 See State v. Lamark,
 
 584 So.2d 686, 696-97 (La.App. 1 Cir.1991),
 
 writ denied,
 
 586 So.2d 566 (La.1991).
 

 [78]
 

 .
 
 See State v. McDowell,
 
 582 So.2d 364, 365 (La.App. 2 Cir.1991),
 
 writ denied,
 
 586 So.2d 567 (La.1991).
 

 [79]
 

 . Of note, the State did not question a white prospective juror who also voted in favor of plaintiff in a civil matter but, of note, Ms. Stevenson and the white prospective juror were not similarly situated in other respects.